UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-CR-10298-RWZ-1

UNITED STATES

v.

BIANCA BLANCHARD

MEMORANDUM & ORDER

June 16, 2021

ZOBEL, S.D.J.

Defendant Bianca Blanchard is accused in a one count indictment of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). She moves to suppress the evidence obtained from the May 29, 2019 seizure of her cell phone (the "Phone") by the Boston Police and the subsequent search of the Phone. Docket # 52. Following an evidentiary hearing and arguments of counsel, the motion is denied.

I.      **Findings of Fact[1]**

Boston Police Department (BPD) Detective Michael Sullivan, BPD Sergeant Detective James Conley,[2] BPD Detective Kevin McElmoyle (collectively "Detectives")

---

[1] The facts are derived from the documentary and testimonial evidence admitted at the evidentiary hearing.  Docket # 56.
[2] For the purposes of this order, I refer to James Conley by the role he occupied on the day in question, Sergeant Detective.  By the time of the hearing, he had been promoted to Lieutenant Detective.

and defendant's mother, Rose Blanchard,[3] testified at the hearing on defendant's motion.

On May 29, 2019, at approximately 1:00 PM, Blanchard exited a residence located at 35 Middleton Street, Boston, MA through a side door.  She walked towards the street and stopped just behind a gate to the driveway.  One car passed.  As the next car, a black sedan, drove by, Blanchard pulled out a firearm and fired a single shot at the sedan.  She then turned and walked back toward the same side door, the firearm in one hand and a small unknown object in the other.

At approximately 1:45pm, Detectives responded to a 911 call about a second set of shots fired.[4]  They found expelled shell casings on the street and ballistic damage to the exterior and interior walls of the first-floor apartment at 35 Middleton Street. Sergeant Detective Conley spoke with a third-floor occupant, later identified as defendant, who told him that she was all right and that there was no damage to the third-floor apartment.  Detective McElmoyle learned that the building had cameras.  He asked one Sandra Carney, the property manager and defendant's aunt, and asked to review the footage from the cameras.

At about 3:30 PM, Detectives received the camera footage, which depicted the events from 1:00 PM that day.  Ms. Carney identified the woman in the video as defendant.  Sergeant Detective Conley also recognized the woman as the same third-floor occupant he had spoken to earlier in the day at 35 Middleton Street.

At about 4:15 PM, Detectives and several uniformed police officers went to 35 Middleton Street to arrest defendant.  Detective McElmoyle stood in the front of the

---

[3] For clarity, I refer to defendant's mother as Rose.

[4] There is no suggestion that defendant was the perpetrator in the second shooting.

2

residence between the front and side doors as part of a perimeter guard around the property. Sergeant Detective Conley and Detective Sullivan led a group of officers up the stairs to the third-floor apartment. They knocked on the door, announced themselves as police, and instructed the occupants to open the door. BPD heard movement inside the apartment and continued to knock. Sergeant Detective Conley testified that he was worried that somebody may be arming themselves with a weapon or discarding evidence inside. Approximately one to two minutes later, defendant opened the door and was arrested.

Defendant's location immediately following the arrest is disputed. Rose testified that BPD "snatched" defendant from the apartment entryway once Blanchard opened the door. She did not see defendant inside the apartment again that day. Sergeant Detective Conley testified that defendant was arrested outside of the apartment, on the third-floor landing. Neither Sergeant Detective Conley nor Detective Sullivan could recall at what point defendant was transported to the police station. Detective McElmoyle, who was outside the building at the time of the arrest, went up to the third-floor apartment when he learned that defendant was in custody. He testified that when he entered the apartment, defendant was in handcuffs standing in front of the couch in the living room. The evidence is clear and I find that defendant was arrested when she opened the door, that the arrest took place on the landing outside the apartment, and that defendant was immediately transported to the police station.

When the police entered the apartment, they encountered Rose, a male individual, and a dog. Sergeant Detective Conley explained to Rose that the apartment would be frozen pending a search warrant and that she would need to leave. Detective

3

Sullivan conducted a protective sweep of the apartment. Detective McElmoyle testified that when he entered the apartment, he saw the Phone on the couch next to where defendant was allegedly standing and seized it. He then escorted Rose to her bedroom to gather some of her belongings and at that point asked her whether the Phone belonged to defendant. His testimony is that Rose confirmed that the Phone was defendant's. Rose denies having any conversation about the Phone with police.

When asked why he seized the Phone, Detective McElmoyle noted that there had been two shootings that day. He had determined from the video footage that defendant may have been waiting for the arrival of a specific car. He thought that there could be evidence on the Phone that could link BPD to the other person in the black sedan. He testified that he did not leave the Phone on the couch to be included in the search warrant because it was a chaotic scene where people were talking, there was yelling, there were people walking around the apartment, and the Phone was within defendant's reach. He stated that he seized it as incident to a lawful arrest.

After the apartment was cleared, Detectives met back at the District B-3 police station. Detective McElmoyle gave the Phone to Detective Sullivan, who placed it in an evidence bag and stored it at his desk. Detective Sullivan testified that he intended to write a search warrant for the Phone's contents, but never took significant steps to do so. BPD did, however, secure a search warrant for the residence. Notably, the warrant application did not include the Phone.

Detective Sullivan was the lead detective assigned to the investigation. He had completed detective training the month prior to the incident in question and had never written a warrant to search a phone. He stated that in early June 2019, he had 40

4

cases, which he characterized as a significant caseload.  The detectives all testified that

they were unaware of any requirement to apply for a phone search warrant within a

specific time.

On August 15, 2019, a federal grand jury indicted Blanchard for the instant

offense.  Detective Sullivan met with a federal agent on August 22, 2019 and discussed

the seizure of the Phone.  He turned over the Phone to the agent  "a few days" after the

initial meeting.  On September 25, 2019, a federal agent sought and obtained a search

warrant for the Phone.  The government began the extraction of the Phone's contents

on September 26, 2019 and subsequently found several photographs of the firearm

listed in the indictment.

## II.    Discussion

### a.  Seizure of the Cell Phone

The Fourth Amendment protects against warrantless searches and seizures, but

for a few limited exceptions, Katz v. United States, 389 U.S. 347, 357 (1967), which

include evidence seized in "plain view."  See United States v. Hamie, 165 F.3d 80, 82

(1st Cir. 1999) (quoting Horton v. California, 496 U.S. 128, 136 (1990)).  An officer may

seize evidence in plain view if (1) "the officer did not violate the Fourth Amendment in

arriving at the place from which the evidence could be plainly viewed" and (2) "the

evidence's incriminating character [was] 'immediately apparent' to the officer."  Id.  "The

term 'immediately apparent' has been defined as sufficient to constitute probable cause

to believe it is evidence of criminal activity."  Hamie, 165 F.3d at 83 (quoting United

States v. Giannetta, 909 F.2d 571, 578 (1st Cir. 1990)).  It requires "more than a hunch,

guesswork, and cop-on-the-beat intuition, but less than proof beyond a reasonable

doubt or a near certainty that the seized item is incriminating."  Giannetta, 909 F.2d at

579 (internal quotations and citations omitted). "There must be enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime." Id.

Defendant does not contest the lawfulness of the arrest. To be sure, Boston Police made the arrest under exigent circumstances. Two individuals, defendant's aunt and Sergeant Detective Conley, identified defendant in a video in which she discharges a firearm from the driveway of 35 Middleton Street toward a passing vehicle. The video then shows that she returned to the residence with the firearm. Detective Sullivan testified that police effectuated the arrest without an arrest warrant based on defendant's demonstrated propensity to use a firearm, which they concluded was still on the property.

As to the Phone's incriminating character, defendant argues that at the time of seizure, the police did not have reason to believe the Phone was evidence of a crime. The testimony shows otherwise. Upon reviewing the video footage, Detectives deduced that the second shooting may have been a retaliatory incident for the shooting depicted on video at 1:00 PM. The video shows that defendant exited the residence about thirty seconds before the black sedan drove by. She did not respond to the first vehicle that passed but fired as soon as the black sedan was in view. Her timing and demeanor suggest that she was waiting for the arrival of a specific car. Detective Sullivan also testified that the woman in the video was holding a small item that, to him, looked like a cell phone as she walked back toward the residence. Detectives therefore concluded that defendant was in communication with someone who informed her when the black sedan would approach. When Detective McElmoyle saw the Phone on the couch, he

6

reasonably expected that there could be evidence on the Phone that would link police to a person in the black sedan.  See Riley v. California, 573 U.S. 373, 401 (2014) (acknowledging that "cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals.").  Under the circumstances, the phone was in plain view and lawfully seized.

> **b.** Delay in Obtaining a Search Warrant

Even if a seizure is "reasonable at its inception because [it is] based on probable cause," it "may become unreasonable as a result of its duration."  Segura v. United States, 468 U.S. 796,  812 (1984).  "There is unfortunately no bright line past which a delay becomes unreasonable."  United  States v. Burgard, 675 F.3d 1029, 1033 (7th Cir.).  Instead, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  Id. (quoting United States v. Place, 462 U.S. 696, 703 (1983)).  The infringement on an individual's Fourth Amendment rights hinges on her "possessory interest in the seized object."  Id. (noting that a seizure does not affect privacy or liberty interests).  The government's interest, on the other hand, depends on "the strength of the state's basis for the seizure."  Id.  "[T]he Fourth Amendment will tolerate greater delays after probable-cause seizures" compared to seizures "resting only on reasonable suspicion."  Id.  A final consideration is whether the police diligently pursued their investigation.  A diligent operation suggests that "the police interest is legitimate and that the intrusion is no greater than reasonably necessary."  Id. (citing Illinois v. McArthur, 531 U.S. 326, 331 (2001)).  When police

delay seeking a warrant without a good explanation, the state appears "indifferent to searching the item and the intrusion on an individual's possessory interest is less likely to be justifiable." Id.

Defendant asserts that the approximately four-month delay between the May 29, 2019 seizure of the Phone and the September 25, 2019 application for a warrant to search it was unreasonable, and that therefore, the evidence obtained from the search should be suppressed. Nevertheless, she had a diminished possessory interest in her Phone. She never asked for the return of the Phone, nor could she have because she has been incarcerated ever since the date in question. See United States v. Conley, 342 F. Supp. 3d 247, 269 (D. Conn. 2018) (finding that defendant had a diminished possessory interest in her cell phone because she had been in custody since his arrest); United States v. Brantley, No. 1:17-CR-00077, 2017 WL 5988833, at *2 (N.D. Ga. Dec. 4, 2017) (same).

The government argues that the delay was reasonable under the circumstances. Detective Sullivan was a newly minted detective who had never written a search warrant application prior to this case. He was getting up to speed while working on a large caseload. Federal authorities learned about the Phone in late August 2019. Over the course of a month, federal agents processed a large volume of evidence and in late September, applied for the search warrant for the Phone. When they searched the Phone, they found evidence connecting defendant to the firearm.

The record shows that law enforcement held the Phone for a time period longer than was necessary to secure a warrant. However, weighed against defendant's

diminished possessory interest and the transfer of the case from the state to the federal authorities, the four-month delay was not unreasonable.

### c. Exclusionary Rule

The exclusionary rule requires the suppression of evidence obtained as a result of an unlawful search or seizure.  United States v. Bienvenue, 632 F.2d 910, 913 (1st Cir. 1980).  Even if the four-month delay were unreasonable, the exclusionary rule's deterrence benefits do not outweigh its substantial costs in this case.  The Phone was seized following a shooting in a residential neighborhood in broad daylight.  To suppress the evidence would be to "ignore reliable, trustworthy evidence bearing on guilt or innocence."  United States v. Berroa, No. 19-cr-10164, 2021 WL 149254 at *13 (D. Mass. Jan. 15, 2021) (internal quotations and citations omitted) (declining to apply the exclusionary rule even though fifteen-month delay in seeking phone search warrant violated the Fourth Amendment).

Deterrence benefits do not outweigh the value of admitting the evidence where police act in good-faith or their "conduct involves only simple, isolated negligence."  Id. at *14 (quoting United States v. Levin, 874 F.3d 316, 322 (1st Cir. 2017)).  This is a case where BPD focused their investigation on witness interviews and documentary evidence, including a video of the shooting, a firearm, and ammunition.  Detectives testified that they were unaware of any legal requirements to seek a phone search warrant within a specific time frame.  The federal government, which was not involved in the initial investigation, then needed time to process the evidence when it adopted the case.  The delay in applying for the warrant does not constitute the type of "deliberate,

9

reckless, or grossly negligent" conduct that the exclusionary rule is designed to deter. Id. at *13.

## III.    Conclusion

Accordingly, the motion to suppress (Docket # 52) is DENIED.

June 16, 2021
DATE

RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE

10